## Hopper v. Commonwealth.

December 6, 1949.

H. K. Spear for appellant.

A. E. Funk, Attorney General, and Zeb A. Stewart, Assistant Attorney General, for appellee.

JUDGE HELM—Reversing.

Appellant, James Hopper, 18 years of age, was charged with the crime of rape upon his cousin, Edith Evans, seven years of age. He was found guilty and his punishment fixed at five years in prison. He appeals.

On May 14, 1949, appellant was visiting his aunt, Lucille Bumgardner, at her home on Unity Hill in Somerset. That afternoon Mrs. Bumgardner, age 24, Edith's mother, went to work, returning to her home about midnight. She left Edith and two of her smaller children in appellant's care.

According to the testimony of Edith, she is in the third grade; her mother and father, John Evans, are separated. The last night James Hopper, who lives in Cincinnati, was visiting them, she and her "little brothers" were at home; James Hopper was staying with them; she and her brothers, one six and the other three, went to bed; James Hopper was in an adjoining room; he asked her if she wanted to come in there and lie down; she went in his room and got in his bed. Asked if he did anything to her, she answered, "He bothered me * * * in bed." Asked by the Commonwealth's attorney to "Tell the jury how he bothered you. Just what did he do to you, can you tell them, little girl, did he put his privates, his private parts in you?" she answered: "Yes, mam." Asked if she cried, she answered. "No." Asked what did she do, she answered, "Started to go to sleep. Went on to sleep." Asked how long he mistreated her, she answered, "A little while." She did not wake up when her mother came home. She did wake up the next morning. James Hopper was still there. She told her mother and Ida Mae Jennings about this. Her mother said she "was going to get him." Several days later she began to have trouble down where he mistreated her. Her mother took her to Dr. Smith because she was sore. He gave her some shots. The first time she told her mother she

had been playing with herself; the second time she didn't. James did not threaten her if she told.

James Hopper returned to Cincinnati Sunday, May 15. Some days after he left, Ida Mae Jennings, who lived near the Bumgardner home, noticed a "little dingy looking stuff on her panties." She spoke to Edith's mother about it. Later Edith told her that "Jimmy had messed" with her. Ida Mae Jennings, recalled by the Commonwealth, testified that some days after Hopper had left, Edith told Edith's mother and her about Hopper mistreating her.

James Strunk, turnkey at the jail, was present when James Hopper made a statement which was reduced to writing on the typewriter. Hopper signed that statement in his presence. Strunk identified the signature. The court, over the objection of defendant's counsel, permitted counsel for the Commonwealth to read the statement to the jury.

Dr. Smith, a witness for the Commonwealth, a licensed and practicing physician of Somerset, was called upon to treat Edith at his office. She had a "vaginal infection * * * accompanied with a discharge." From the history of the case, she had this discharge "approximately a week, I don't remember exactly. * * * I gave her penicillin shots * * * two shots." He also gave her some medicine for the walls of her vagina. He did not make a smear for the purpose of telling the cause of this condition. The cause could have been gonorrhea or some other venereal disease. He couldn't and wouldn't say as to that. According to the mother, her condition cleared up. He treated her May 21 and 23. He had not examined her since.

Dr. Carl Norfleet, called by the defendant, made an examination of Edith's vagina on May 26. Upon "examination of the genitals we found no evidence of disease. On opening the labia we found a hymen, normal and intact, and no evidences of injury." He took a specimen of blood and also a smear from the vagina. The laboratory report showed them both to be negative. A partial penetration might be possible without a rupture of the hymen. Dr. M. C. Spradlin examined Edith with Dr. Norfleet on May 26. Examination of the vagina revealed "there was no indication that the hy-

men was broken." The hymen in a child this age is located back, "possibly a quarter of an inch." He did not find any discharge. Dr. A. J. Wahle examined Edith about a week before the trial on June 9, 1949. He couldn't "find any evidence that she had * * * been entered by a man or anything. The hymen was not ruptured."

The evidence for the defendant is: James Hopper lives in Cincinnati with his mother, a sister of Edith's mother. He was at the Bumgardner home; Edith and her two small brothers were left with him; Edith went to sleep on a baby bed; her two small brothers in another bed; he was in the next room; Edith told him that she was scared; he was "laying on the bed;" he had his clothes on; was fully dressed; he told her "to come in there and get in bed;" he dozed off and went to sleep; Edith's mother came home about 11:30 or 12; he still had his clothes on; the little girl was in his bed when the mother came home; he did not mistreat or bother Edith in any way; he went back to Cincinnati about noon the next day. He, over the objection of his counsel, stated that he made the statement read to the jury.

Lucille Bumgardner, called as a witness for the defendant, is 24 years of age, the mother of Edith. James Hopper is her sister's son. She and her children had visited her sister at Cincinnati; James Hopper came home with them. Edith first made complaint to her about her privates late Tuesday night. Some days after James went back to Cincinnati, Edith told her that "maybe some little boys had been playing with her," and then she said "maybe Jimmy played with me" while she was asleep. She took Edith to the doctor because "she was raw." She had not noticed any discharge. It was about 9:30 Sunday morning when James left.

Appellant assigns as errors: (1) The trial Court erred in overruling appellant's motion for a directed verdict; (2) the verdict is contrary to both the law and the evidence; (3) the verdict is palpably and flagrantly against the weight of the evidence, and is the result of passion and prejudice; (4) the trial court failed to give the whole law of the case, and (5) incompetent and prejudicial evidence was introduced over appellant's objection and exception.

From the testimony which we have summarized, it appears that there was sufficient evidence to take the case to the jury. Appellant suggests that an instruction on detaining a woman should have been given. The trial court instructed on rape, and attempted rape. Under the testimony in this case we believe that these instructions were proper, and that an instruction on detaining a woman should not be given. See Wright v. Commonwealth, 267 Ky. 441, 102 S. W. 2d 376.

Appellant's testimony is substantially the same as set out in the statement read to the jury over the objection of appellant. KRS 422.110, since the amendment of 1942 (see Acts 1942, Ch. 141), provides that the competency and admissibility of such a statement shall be determined by the trial judge from testimony heard by him, independent of and without the hearing of the jury trying the case. It appears that this statute was not complied with in this case.

Appellant complains that witnesses were permitted to state to the jury the complaint made by Edith to them. In Wright v. Commonwealth, supra, we held that evidence as to complaint of rape by prosecutrix must be confined to bare fact that complaint was made, and details or particulars of complaint are not admissible as substantive testimony unless statement is part of res gestae. Here, Edith's statements, made to her mother and Mrs. Jennings several days after the act complained of, are clearly not res gestae and were inadmissible. Because of this error the case must be reversed. All other questions are reserved.

The judgment of the trial court is reversed with directions for proceedings not inconsistent with this opinion.